**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IAN MILLER AND DONG WOO CHOO, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>F.T. PUBLICATIONS, INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS


INTRODUCTION ........ 1

THE PARTIES ........ 3

JURISDICTION AND VENUE ........ 3

FRAUDULENT CONCEALMENT AND TOLLING ........ 3

SUBSTANTIVE ALLEGATIONS ........ 4

- A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ........ 4
- B. Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies. ........ 10
- C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website. ........ 16
  - 1. The Website Causes the Interception of the Contents of Communications. ........ 16
  - 2. Google Cookies. ........ 19
  - 3. Additional Third Party Cookies. ........ 27
- D. The Third Parties Intercept User Communications While in Transit. ........ 28
- E. The Signaling and Addressing Information Intercepted by the Third Parties. ........ 30
- F. The Private Communications Collected are Valuable. ........ 31

PLAINTIFFS' EXPERIENCES ........ 33

CLASS ALLEGATIONS ........ 38

CAUSES OF ACTION ........ 40

- First Cause of Action: Invasion of Privacy ........ 40
- Second Cause of Action: Intrusion Upon Seclusion ........ 43
- Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........ 45
- Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ........ 48
- Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ........ 49
- Sixth Cause of Action: Unjust Enrichment ........ 53

PRAYER FOR RELIEF ........ 54

Plaintiffs Ian Miller and Dong Woo Choo (collectively, "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against F.T. Publications, Inc. ("Defendant"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's website (https://www.ft.com/, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "manage cookies" as shown in the following screenshot:




2. Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to "manage cookies" to reject the sale of their personal data and "block" personal adverts and cookies that are used for "personalized advertising, personalized marketing and other purposes that are not considered necessary for the operation of our Sites" in the Website's cookie preference window, Defendant nonetheless caused multiple third parties—including Google LLC (DoubleClick and Google Analytics), X Corp (Twitter), LinkedIn Corporation (a subsidiary of Microsoft Corp.)—to place and/or transmit cookies that

tracked users' website browsing activities and enabled the Third Parties to intercept their private communications on the Website (the "Third Parties").

4. Contrary to users' express rejection of unnecessary cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they clicked or selected the "manage cookies" link on the Website's cookie consent banner and rejected unnecessary cookies, including those used for personalized advertising in the Website's cookie preference window. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Ian Miller is, and was at all relevant times, an individual and resident of Oakland, California. Plaintiff intends to remain in California and makes his permanent home there.

8. Plaintiff Dong Woo Choo is, and was at all relevant times, an individual and resident of Alhambra, California. Plaintiff intends to remain in California and makes his permanent home there.

9. Defendant F.T. Publications, Inc. is a New York corporation with its headquarters and principal place of business in New York, New York.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12. Further, the Private Communications and data that Defendant causes to be intercepted by Third Parties are routed through servers located in California.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## FRAUDULENT CONCEALMENT AND TOLLING

15. The delayed discovery rule applies to Plaintiffs' and Class members' claims. Plaintiffs and Class members were unaware that, despite blocking all personalised advertising

and unnecessary cookies on the Website, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs and Class members could not reasonably have discovered this conduct at the time of their visits to the Website because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' or Class members' experiences on the Website would have alerted a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Website honored their opt-out selections or instead continued transmitting their data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

16. On or about November 7, 2025, Defendant was notified by Plaintiffs' counsel that it was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and intercepted by third parties despite users' blocking of personalised advertising and unnecessary cookies and the sharing/selling of user information. Despite this notice, Defendant did not disclose this conduct to users.

17. Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could block unnecessary cookies, including personalised advertising cookies, while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. These circumstances, including Defendant's concealment and misleading representations, warrant tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

18. Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to

and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

19. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

20. As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

21. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

22. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website

to identify the device making the requests, and to record a session showing how the user interacts with the website.

23. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

24. A third-party cookie is set by a third-party domain/webserver (e.g., google.com, twitter.com, linkedin.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

25. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions:** Data on which links, buttons, or ads on the Website a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, articles or topics searched for, or topics engaged with;
- **Reading and Subscription Behavior:** "Information about Website articles and other content viewed and subscription-related activity;"
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;
- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

26. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and content preferences to enable content recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies

are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

27. Defendant publishes the Financial Times, a news publication that provides business, financial, economic, markets, and other news, analysis, and commentary. Defendant owns and operates the Website, which allows visitors to, among other things, read and search for news articles and other content; obtain information regarding companies, markets, finance, economics, and other topics; access videos, podcasts, and other digital content; subscribe to newsletters and other communications; and purchase and manage subscriptions. As users interact with the Website—including by entering information into forms, searching for articles or topics of interest, viewing particular articles and other content, clicking links, subscribing to newsletters or other communications, and making other selections—they communicate Private Communications to Defendant, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, including whether the user is located in California.

28. Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or intercepted by third parties.

29. Defendant explained the third-party cookies it used on the Website as follows in its Cookie Policy:

> **What are cookies?**
>
> Cookies are small text files which a website may place on your computer or device when you visit a site. The cookie will help the website, or another website, to recognise your device the next time you visit. Web beacons, pixels or other similar

files can also do the same thing. We use the term "cookies" in this policy to refer to all files that collect information in this way. Cookies serve many functions. For example, they can help us to remember your username and preferences, analyse how well our Sites are performing, or allow us to recommend content we believe will be most relevant to you.

The majority of websites use cookies to collect and retain personal information about their visitors. Most cookies collect general information, such as how visitors arrive at and use our Sites, the device they are using, their internet protocol address (IP address), what pages they are viewing and their approximate location (for example, we would be able to recognise that you are visiting our Sites from London).

**Purpose of cookies**

We group our cookies into the below categories.

**Operating our Sites**

Some cookies are essential for the operation of our Sites. This includes cookies for the following purposes:

- **Access** – we use these cookies to identify subscribers and ensure access to subscription only pages, including premium access.
- **Billing** – if your subscription is provided by your employer or educational institution under a group subscription, we use cookies for the purposes of measuring activity and billing.
- **Performance** – we use these cookies to monitor Site performance. This allows us to provide a high quality experience by quickly identifying and fixing any issues that arise. For example, we might use performance cookies to track error messages, and to determine improvements to our Sites.
- **Functionality** – we use functionality cookies to allow us to remember your preferences. For example, we use functionality cookies to provide you with enhanced services, such as allowing you to watch a video online or comment on a blog.
- **Analytics** – we use cookies to help us understand our audience and the success of advertising campaigns. For example, we count articles views to present 'Most Read' content. We also use analytics cookies to keep track of how many advertising impressions have been served for a campaign and to manage the frequency at which you see the same adverts.
- **Fraud prevention** – we use cookies to monitor and prevent suspicious activity and fraudulent traffic

**Personalisation**

We use cookies to improve your experience of our products by personalising our Sites. For example, we help you to find new content and recommend email alerts based on the topics you read. Where our Sites have such functionality, you can manage elements of personalisation in your account.

**Advertising**

We use cookies to serve you with advertisements that we believe are relevant to you and your interests. You may see these advertisements on our Sites and on other sites that you visit. For example, if you read a number of articles on motoring on FT.com or on other sites, you would see more car advertisements as we have

> inferred that you are interested in this topic. You may also see advertisements for our products and services on other websites if you have previously visited our Sites…
>
> **Third party cookies on our Sites**
>
> We also use third party cookies on our Sites that fall into the categories above (“third party cookies”) for the following reasons:
>
> - to help us monitor traffic on our Sites (like many companies, we use Google Analytics to do this);
> - to identify fraudulent or non-human traffic;
> - to assist with market research;
> - to improve Site functionality;
> - to monitor compliance with our terms and conditions and copyright policy.
>
> We also use third party cookies for the purpose of programmatic advertising. This is where we sell digital advertising space through the use of automated technology via Google Doubleclick (AdX).
>
> These third party cookies are used within programmatic for measurement and attribution, and management of frequency. They may also be used for personalisation of advertisements based on data you have shared with third parties, to the extent that you have consented to this.
>
> Advertisers sometimes use their own cookies to measure performance and to identify fraudulent or non-human traffic. To the extent that you have given them your consent to do so, advertisers may also provide you with targeted advertising based on their data. For example, advertisers may use a profile they have built either on their own site or on sites that you have previously visited to present you with more relevant advertisements during your visit to FT.com.
>
> Our standard advertising terms and conditions do not permit our advertisers to drop their own cookies for profiling or retargeting without your consent… [1]

**B. Defendant Falsely Informed Users That They Could Reject the Website’s Use of Cookies.**

30. When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, “We and our 39 technology partners use cookies and other data for a number of reasons, such as keeping FT Sites reliable and secure personalising content and ads, providing social media features and to analyse how our Sites are used. You have the option to manage cookies.” The banner purported to provide users the

[1] Financial Times Cookies Policy (Effective from 5/14/2018) (available at https://help.ft.com/legal-privacy/cookies/) (the “Cookie Policy”).

opportunity to choose not to accept cookies but instead click the "manage cookies" link to adjust their cookie preferences as shown, in the following screenshot from the Website:[2]




31. Plaintiffs and other Website users who clicked or selected the "manage cookies" link were then directed to Defendant's cookie preference window. There, Defendant further represented, "You can use the options on this page to manage the cookies that are set on your device, as well as objecting to the "sale" of your personal information… Under US privacy legislation, such as the California Privacy Rights Act, you have the right to opt out of the sale or sharing of your personal information. The definitions of "sale" and "share" are extremely broad and may include sharing certain pieces of information with our advertising partners, such as cookie identifiers, geolocation and interactions with advertisements, for the purpose of showing you advertising that is relevant to your interests." Accordingly, Defendant provided users the option to elect to "Block" or "Allow" next to each category of "See personalized adverts" and "Cookies" indicating that users could block all categories of cookies, other than "cookies necessary for the operation" of the Website, all of which Defendant also further defined as follows:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

[2] Defendant has made changes to the cookie consent banner but it still provides Website users the opportunity to "Manage Cookies" and block cookies in the cookie preference window.







32. Plaintiffs and other Website users who clicked or selected the "Block" button next to the "See personalized adverts" and "Cookies" categories followed by the "Save and Exit" button, indicating their choice and/or agreement to block or reject all unnecessary cookies and

tracking technologies in use on the Website, could then continue to browse the Website, and the popup cookie consent banner and cookie preference window disappeared.

33. Defendant's popup cookie consent banner and "cookie preference" window led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those that were used for "personalized advertising, personalized marketing." The banner and cookie preference window further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon blocking personalised adverts and unnecessary cookies in the cookie preference window.

34. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users blocked personalised adverts and unnecessary cookies in the cookie preference window, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

35. Nevertheless, even after receiving that notice, Defendant caused third-party tracking cookies, including the Third Parties' cookies, to be placed on Website users' browsers and devices and/or transmitted to the Third Parties, thereby enabling the Third Parties to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by blocking or rejecting personalised adverts and unnecessary cookies in the cookie preference window, Defendant failed to prevent cookies from being transmitted to the Third Parties, enabling them to track user behavior and communications.

36. Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshot, obtained using one such tool, shows examples of the Third Parties' cookies being transmitted from a Website user's device and browser to Third Parties even after the user selected 'Block' for "personalised adverts" and "cookies" in the cookie preference window.



37. The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://ft.com. The screenshot depicts only network traffic occurring ***after*** the user blocked "personalised adverts" and unnecessary cookies in the cookie preference window.

38. As shown above, despite the user's rejection of all unnecessary cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third-party web domains like google.com, twitter.com, linkedin.com, and others. As further shown in the right-hand column of the screenshot, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be intercepted by Third Parties, even after consumers declined or rejected all unnecessary cookies and tracking technologies by blocking "personalised adverts" and "cookies" in the cookie preference window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of personalised adverts and unnecessary cookies.

39. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

40. As users interact with the Website, even after blocking 'personalised adverts' and unnecessary cookies in the cookie preference window, more data regarding users' behavior and communications are intercepted by the Third Parties alongside the cookie data. This occurs despite users' rejection of unnecessary cookies and similar technologies for personalized content, advertising, analytics, and the sale or sharing of personal information with third parties for such purposes. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications,

on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

41. The Third Parties' code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

## C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.[3]

### 1. The Website Causes the Interception of the Contents of Communications.

42. The Website includes a search bar and other input fields through which users enter information. For example, below is a screenshot of the search bar currently available on the Website where users can type into the search box to cause the Website to search its contents.




[3] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had blocked unnecessary cookies, including those used for personalized advertising.

43. When users input the information into the search field, they intend to communicate the contents of their searches directly to the Website.

44. Instead, Defendant programmed the Website such that the contents of those communications are transmitted to, and intercepted by, the Third Parties while the communications are in transit between users' browsers and the Website.

45. For example, the Website causes users' search queries to be transmitted to the Third Parties, even after users have rejected all personalised adverts and unnecessary cookies. When a user submits a search, the Website loads a results page that includes the user's query in the URL. The Website then transmits that URL to third parties, thereby disclosing the full search query to those parties. For instance, a test search string ("Markets") was transmitted to the Third Parties, along with associated identifiers and metadata, after a user blocked personalised adverts and unnecessary cookies:




(showing the search string "Markets" being sent to googleads.g.doubleclick.net)




(showing the search string "Markets" being sent to google.com)




(showing the search string "Markets" being sent to td.doubleclick.net)




(showing the search string "Markets" being sent to analytics.twitter.com)




(showing the search string "Markets" being sent to px.ads.linkedin.com)

**2. Google Cookies.**

46. Defendant causes third-party cookies to be transmitted to and from users' browsers and devices on the Website, even after users block or reject all unnecessary cookies, to

and from the **doubleclick.net** and **google.com** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[4] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[5] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[6]

47. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[7] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

---

[4] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[5] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[6] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[7] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

48. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[8] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link," or "searches [] website or app"; and "selects content on [] website or app".[9]

49. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) reading and subscription behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[10]

50. For example, the Google software code that Defendant caused to be stored on and executed by a Website user's device causes the following data to be sent to Google's domain, at doubleclick.net:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[8] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[9] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735?hl=en).

[10] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

GET
200

https://td.doubleclick.net/td/rul/801156123?random=1708
043459za200&gcd=13l3l3l3l1&dma=0&tcfd=10000&u_w=1512&u_
bel=duF0COqGzasBEJvYgv4C&hn=www.googleadservices.com&fr
_1.3&auid=535661399.1708622919&uaa=arm&uab=64&uafvl=Not
9.216&uamb=0&uap=macOS&uapv=13.6.2&uaw=0&fledge=1&capi=

**Request** Header Query Body Cookies Raw | Summary +

| Key | Value |
|---|---|
| :authority | td.doubleclick.net |
| :method | GET |
| :path | /td/rul/801156123?random=1708622918250&cv=11&fst=1708622918250&fmt=3&bg=ffffff&guid=ON&async=1&gtm=45He42h0v812043459za200&gcd=13l3l3l3l1&dma=0&tcfd=10000&u_w=1512&u_h=982&url=https%3A%2F%2Fwww.ft.com%2Fus-economy&ref=https%3A%2F%2Fwww.ft.com%2F&label=duF0COqGzasBEJvYgv4C&hn=www.googleadservices.com&frm=0&tiba=US%20economy&value=0&bttype=purchase&npa=0&us_privacy=error&pscdl=control_1.3&auid=535661399.1708622919&uaa=arm&uab=64&uafvl=Not_A%2520Brand%3B8.0.0.0%7CChromium%3B120.0.6099.216%7CGoogle%2520Chrome%3B120.0.6099.216&uamb=0&uap=macOS&uapv=13.6.2&uaw=0&fledge=1&capi=1&ct_cookie_present=0 |
| :scheme | https |
| accept | text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp,image/apng,*/*;q=0.8,application/signed-exchange;v=b3;q=0.7 |
| accept-encoding | gzip, deflate, br |
| accept-language | en-US,en;q=0.9 |
| cookie | ar_debug=1; IDE=AHWqTUI-gPtjcygSUiRRXomQ6ybjIl6vwlAlKcSiq49mURfEYH9aKI9pt29EJAJwdSM; DSID=ANfR7bNjbmvfl2RNTxOeXqlJf9m24kCFY-nFPNMzvUiKnlQ0JW9i1Fte6Hub5yXNAh6Gjvh6K8EkpSqVnODpxCRYGDOBwVueLo8JkVGohjzapNUun46ZFMGN4nidwCeUf2KIseT3WNlpgWf0eEZS3-s-tBnhRe2O_BlrrQ8PtCVZkm8Ef0d7_9AblnATUolHLIJocd5D4mfzSfvNQE0RjogDHssg2zf_dRTHmogYmAfFhirCpByaruJKs3uPr5zPd-YJAF7MNa1qVwtrlq8gLhvfpy7_7Rn0Z22xFICvmMUOa-39-1rmzzA |

| | |
|---|---|
| Host | td.doubleclick.net |
| referer | https://www.ft.com/ |
| sec-ch-ua | "Not_A Brand";v="8", "Chromium";v="120", "Google Chrome";v="120" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | iframe |
| sec-fetch-mode | navigate |
| sec-fetch-site | cross-site |
| upgrade-insecure-requests | 1 |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/120.0.0.0 Safari/537.36 |
| x-client-data | CIy2yQEIprbJAQipncoBCKWQywEIlqHLAQiGoM0BCN/rzQEIxu7NAQiD8M0BGOzTzQEYp+rNARjrjaUX |

GET

200

https://td.doubleclick.net/td/rul/801156123?random=1708
043459za200&gcd=13l3l3l3l1&dma=0&tcfd=10000&u_w=1512&u_
bel=duF0COqGzasBEJvYgv4C&hn=www.googleadservices.com&fr
_1.3&auid=535661399.1708622919&uaa=arm&uab=64&uafvl=Not
9.216&uamb=0&uap=macOS&uapv=13.6.2&uaw=0&fledge=1&capi=

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| async | 1 |
| auid | 535661399.1708622919 |
| bg | ffffff |
| bttype | purchase |
| capi | 1 |
| ct_cookie_present | 0 |
| cv | 11 |
| dma | 0 |
| fledge | 1 |
| fmt | 3 |
| frm | 0 |
| fst | 1708622918250 |
| gcd | 13l3l3l3l1 |
| gtm | 45He42h0v812043459za200 |
| guid | ON |
| hn | www.googleadservices.com |
| label | duF0COqGzasBEJvYgv4C |

| | |
|---|---|
| npa | 0 |
| pscdl | control_1.3 |
| random | 1708622918250 |
| ref | https://www.ft.com/ |
| tcfd | 10000 |
| tiba | US economy |
| u_h | 982 |
| u_w | 1512 |
| uaa | arm |
| uab | 64 |
| uafvl | Not_A%20Brand;8.0.0.0\|Chromium;120.0.6099.216\| Google%20Chrome;120.0.6099.216 |
| uamb | 0 |
| uap | macOS |
| uapv | 13.6.2 |
| uaw | 0 |
| url | https://www.ft.com/us-economy |
| us_privacy | error |
| value | 0 |

GET
200

https://td.doubleclick.net/td/rul/801156123?random=17086
043459za200&gcd=13l3l3l3l1&dma=0&tcfd=10000&u_w=1512&u_h=
bel=duF0COqGzasBEJvYgv4C&hn=www.googleadservices.com&frm=
_1.3&auid=535661399.1708622919&uaa=arm&uab=64&uafvl=Not_
9.216&uamb=0&uap=macOS&uapv=13.6.2&uaw=0&fledge=1&capi=1

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| ar_debug | 1 |
| IDE | AHWqTUI-gPtjcygSUiRRXomQ6ybjll6vwlAlKcSiq49mURfEYH9aKl9pt29EJAJwdSM |
| DSID | ANfR7bNjbmvfl2RNTxOeXqlJf9m24kCFY-nFPNMzvUiKnlQ0JW9i1Fte6Hub5yXNAh6Gjvh6K8EkpSqVnODpxCRYGDOBwVueLo8JkVGohjzapNUun46ZFMGN4nidwCeUf2KlseT3WNlpgWf0eEZS3-s-tBnhRe2O_BlrrQ8PtCVZkm8Ef0d7_9AblnATUolHLlJocd5D4mfzSfvNQE0RjogDHssg2zf_dRTHmogYmAfFhirCpByaruJKs3uPr5zPd-YJAF7MNa1qVwtrlq8gLhvfpy7_7Rn0Z22xFlCvmMUOa-39-1rmzzA |

51. The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

52. The "url" parameters disclose to Google the exact webpage and title that the user was viewing.

53. The "u_h" and "u_w" parameters correspond to the user's screen height and width.

54. The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

55. Google documentation confirms that the "IDE" cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[11]

56. Further, as shown above, the Google software code that Defendants caused to be stored on and executed by the user's device causes the user's "user-agent" information to be intercepted by Google. That information discloses to Google the user's device, operating system, and browser.

57. Finally, the data intercepted by Google contains the user's IP address, further enabling Google to obtain the user's geolocation, including whether the user is located in California.

58. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie enables Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, etc.), and to perform targeted advertising and marketing analytics.

[11] https://policies.google.com/technologies/cookies?hl=en-US.

59. Thus, the Google cookies used on the Website enable Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[12]

60. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[13] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

[12] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[13] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

**3. Additional Third Party Cookies.**

61. Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to block all personalised adverts and unnecessary cookies, to and from other domains, including twitter.com and px.ads.linkedin.com.

62. The **twitter.com** domain is associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[14] X Corp uses the collected user data to target users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[15]

63. The **px.ads.linkedin.com** domain is owned by LinkedIn Corporation—a subsidiary of Microsoft Corp. LinkedIn Corporation runs the social media-based business networking platform LinkedIn. Cookies set by the linkedin.com domain are used to target website users with advertising.[16] Specifically, cookies set by the linkedIn.com domain target users with advertising and measure the performance of such ads.[17] These cookies assign a unique ID to users' devices, which allows LinkedIn to track users across the internet, and to collect information regarding IP address, operating system, browser information, web browsing activity—including the URL of both the site the users came from before accessing the website with the linkedin.com cookies and the one to which users navigate when they leave the website with the linkedIn.com cookies—download and purchase activity, and how users interact with ads.[18] Cookies set by the linkedIn.com domain are used to target users with advertisements on and off the LinkedIn social media platform.[19]

64. These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic

[14] *See* https://help.x.com/en/rules-and-policies/x-cookies.
[15] *Id.*
[16] https://cookiepedia.co.uk/host/linkedin.com.
[17] https://www.linkedin.com/legal/cookie-policy.
[18] *Id.*
[19] *Id.*

information, (v) interests and preferences, (vi) reading and subscription behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D. The Third Parties Intercept User Communications While in Transit.**

65. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

66. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

67. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[20] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

68. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations

[20] For example, Google's server-to-server API is the **Google Ads Conversion API**. LinkedIn's is the **Conversions API.** X (Twitter)'s is the **Conversion API.** Thus each of the Third Parties uses a server-to-server API to collect user data.

must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

69. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

70. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

71. On information and belief, the Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[21] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[22] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[23] One use for Dataflow is the "[r]eal-

[21] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.
[22] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.
[23] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

time machine learning (ML) analysis of streaming data."[24] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[25]

72. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E. The Signaling and Addressing Information Intercepted by the Third Parties.**

73. The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiffs' or a Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

74. The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance

[24] *Id.*
[25] *Id.*

of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

75. Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

76. Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F. The Private Communications Collected are Valuable.**

77. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which

Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

78. The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and user engagement, understand users' interests and preferences, and target specific users or groups of users with advertising. For example, Defendant can identify California users who view articles or other content concerning particular news, business, financial, or economic topics and use information regarding those users' interests and browsing activity to target them with advertisements on the Website and across unrelated third-party websites.

79. Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to content available on the Website. At scale, this data enables Defendant to assess trends among its users and across the news and other content they consume. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

80. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[26] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

81. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to

[26] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

accept compensation to sell her data or the consumer's willingness to pay to protect her information.

82. By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Miller**

83. Plaintiff Miller visited the Website on one or more occasions during the last four years to seek and obtain news, information and other content available on the Website while located in California.

84. Plaintiff Miller's visits to the Website were consistent with those of an ordinary Website user seeking news, information, and other content. Specifically, Plaintiff Miller is not a consumer advocate, a "tester," or compliance auditor who visited the Website to test or evaluate Defendant's privacy practices.

85. When Plaintiff Miller visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which stated, "We and our 39 technology partners use cookies and other data for a number of reasons, such as keeping FT Sites reliable and secure personalising content and ads, providing social media features and to analyse how our Sites are used. You have the option to manage cookies." Plaintiff Miller also viewed Defendant's additional representation that users could click "manage cookies."

86. Plaintiff Miller selected and clicked the "manage cookies" link, which caused the cookie preference window to appear. There Defendant provided users the option to elect to "Block" or "Allow" the options to "See personalised adverts" and "Cookies" indicating that users could block all categories of cookies, other than "cookies necessary for the operation" of the Website.

87. Plaintiff Miller saw that he could choose to block or allow personalised adverts and unnecessary cookies, and he believed that choosing "block" would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies, other than those "necessary for the operation of the Website" (but inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services for the purposes of providing advertising and analytics services). Accordingly, Plaintiff Miller clicked the "block" buttons positioned next to the "See personalised adverts" and "Cookies" headings, then clicked or selected the "Save and Exit" button.

88. In selecting the "block" buttons associated with "See personalised adverts" and "Cookies," Plaintiff Miller gave Defendant notice that he did not consent to the use or placement of unnecessary cookies and tracking technologies while browsing the Website. Further, Plaintiff Miller specifically rejected, based on Defendant's representations, those cookies used "for personalised advertising, personalised marketing and other purposes that are not considered necessary for the operation" of the Website. In reliance on these representations and promises, only then did Plaintiff Miller continue browsing the Website.

89. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, and analytics, to be placed on Plaintiff Miller's device and/or transmitted to the Third Parties along with user data, without Plaintiff Miller's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Miller that he could reject the use and/or placement of all unnecessary cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Miller believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

90. Then, as Plaintiff Miller continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Miller's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user

data, including those involved in providing personalized content, advertising, and analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Miller's Private Communications as Plaintiff Miller browsed the Website.

91. Defendant's representations that consumers could block the sale/sharing of their personal information and block all unnecessary cookies while Plaintiff Miller and users browsed the Website, or at least those involved in providing personalized content, advertising, and analytics services, were untrue. Had Plaintiff Miller known this fact, he would not have used the Website. Moreover, Plaintiff Miller reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to block unnecessary cookies, Plaintiff Miller would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

92. Plaintiff Miller continues to desire to browse content featured on the Website. Plaintiff Miller would like to browse websites that do not misrepresent that users can block all unnecessary cookies and tracking technologies. If the Website were programmed to honor users' requests to block all unnecessary cookies and tracking technologies, Plaintiff Miller would likely browse the Website again in the future, but will not do so until then. Plaintiff Miller regularly visits websites that feature content similar to that of the Website. Because Plaintiff Miller does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to block all unnecessary cookies and tracking technologies, Plaintiff Miller will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to

whom. Plaintiff Miller is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Choo**

93. Plaintiff Choo visited the Website on one or more occasions during the last four years to seek and obtain news, information and other content available on the Website while located in California.

94. Plaintiff Choo's visits to the Website were consistent with those of an ordinary Website user seeking news, information, and other content. Specifically, Plaintiff Choo is not a consumer advocate, a "tester," or compliance auditor who visited the Website to test or evaluate Defendant's privacy practices.

95. When Plaintiff Choo visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which stated, "We and our 39 technology partners use cookies and other data for a number of reasons, such as keeping FT Sites reliable and secure personalising content and ads, providing social media features and to analyse how our Sites are used. You have the option to manage cookies." Plaintiff Choo also viewed Defendant's additional representation that users could click "manage cookies."

96. Plaintiff Choo selected and clicked the "manage cookies" link, which caused the cookie preference window to appear. There Defendant provided users the option to elect to "Block" or "Allow" the options to "See personalised adverts" and "Cookies" indicating that users could block all categories of cookies, other than "cookies necessary for the operation" of the Website.

97. Plaintiff Choo saw that he could choose to block or allow personalised adverts and unnecessary cookies, and he believed that choosing "block" would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies, other than those "necessary for the operation of the Website" (but inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services for the purposes of providing advertising and analytics services). Accordingly, Plaintiff Choo clicked the "block" buttons

positioned next to the “See personalised adverts” and “Cookies” headings, then clicked or selected the “Save and Exit” button.

98. In selecting the “block” buttons associated with “See personalised adverts” and “Cookies,” Plaintiff Choo gave Defendant notice that he did not consent to the use or placement of unnecessary cookies and tracking technologies while browsing the Website. Further, Plaintiff Choo specifically rejected, based on Defendant’s representations, those cookies used “for personalised advertising, personalised marketing and other purposes that are not considered necessary for the operation” of the Website. In reliance on these representations and promises, only then did Plaintiff Choo continue browsing the Website.

99. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, and analytics, to be placed on Plaintiff Choo’s device and/or transmitted to the Third Parties along with user data, without Plaintiff Choo’s knowledge. Accordingly, the popup cookie consent banner’s representation to Plaintiff Choo that he could reject the use and/or placement of all unnecessary cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Choo believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

100. Then, as Plaintiff Choo continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Choo’s clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Choo’s Private Communications as Plaintiff Choo browsed the Website.

101. Defendant’s representations that consumers could block the sale/sharing of their personal information and block all unnecessary cookies while Plaintiff Choo and users browsed the Website, or at least those involved in providing personalized content, advertising, and

analytics services, were untrue. Had Plaintiff Choo known this fact, he would not have used the Website. Moreover, Plaintiff Choo reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to block unnecessary cookies, Plaintiff Choo would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

102. Plaintiff Choo continues to desire to browse content featured on the Website. Plaintiff Choo would like to browse websites that do not misrepresent that users can block all unnecessary cookies and tracking technologies. If the Website were programmed to honor users' requests to block all unnecessary cookies and tracking technologies, Plaintiff Choo would likely browse the Website again in the future, but will not do so until then. Plaintiff Choo regularly visits websites that feature content similar to that of the Website. Because Plaintiff Choo does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to block all unnecessary cookies and tracking technologies, Plaintiff Choo will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Choo is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

103. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**<u>Class</u>**: All persons who browsed the Website in the State of California after blocking "See personalised adverts" and "Cookies" in the cookie preference window.

104. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

105. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

106. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or intercepted by third parties along with user data, after Class members chose to block all unnecessary cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

107. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

108. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, blocked unnecessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

109. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

110. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

111. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

112. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

113. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

114. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could block unnecessary cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookie consent banner and cookie preference window on the Website, Plaintiffs and Class members blocked or rejected unnecessary cookies and reasonably expected that their rejection of unnecessary cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

115. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

116. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties—and they in fact do—to, *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

117. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

118. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

119. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

120. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

121. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

122. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

123. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

124. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

125. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

126. The Third Parties' tracking and collecting of Plaintiffs' and the Class members' Private Communications on the Website using third-party cookies that Defendant caused to be

stored on users' devices—and to be intercepted by Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to block unnecessary cookies.

127. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could block unnecessary cookies, as well as state criminal and civil laws designed to protect individual privacy.

128. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could block unnecessary cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be intercepted by third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they blocked or rejected all unnecessary cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

129. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

130. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

131. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

132. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Third Cause of Action</u>: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

133. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

134. California Penal Code § 631(a) provides, in pertinent part:

> "Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] [who] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

135. Defendant is a "person" within the meaning of California Penal Code § 631.

136. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

137. Each of the Third Parties is a separate legal entity that offers software as a service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other.

138. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

139. At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

140. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

141. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicate the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

142. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

143. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to block unnecessary cookies in the cookie preference window.

144. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

145. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

146. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

147. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record,

collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to news. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to block unnecessary cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

148. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

149. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

150. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

151. A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

152. The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

153. At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information), to be transmitted to the Third Parties.

154. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website.

155. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by blocking unnecessary cookies in the cookie preference window.

156. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class members' IP addresses and user-agent information.

157. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

158. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**<u>Fifth Cause of Action</u>: Common Law Fraud, Deceit and/or Misrepresentation**

159. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

160. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could block "See personalized adverts" and "Cookies."

161. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users blocked "See personalized adverts" and "Cookies" in the cookie preference window. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to block unnecessary cookies in the cookie preference window.

162. Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

163. By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

164. Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to disable and/or block unnecessary cookies in the cookie preference window and opt out of the collection, use, sale, and/or sharing of their Private Communications.

165. Industry documentation for the consent management platforms and Third Parties' technologies used on the Website explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the

Website. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Website. Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

166. Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

167. Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See*, *e.g*., California Consumer Privacy Rights Act Regulations, Cal. Code Regs. Tit. 11, § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

168. On information and belief, Defendant either knew its representations regarding users' ability to block cookies and opt out of data selling/sharing were false, lacked any reasonable basis for believing those representations were true, or made those representations carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

169. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to Plaintiffs' and Class members' decisions as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

170. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

171. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

172. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

173. Defendant's representation that consumers could block "See personalized adverts" and "Cookies" (including "cookies used for personalised advertising, personalised marketing and other purposes that are not considered necessary for the operation" of the Website) if they used the toggle to do so was false. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendant disclosed that it caused third-party unnecessary cookies to be stored on Website visitors' devices

used for personalization, advertising, and analytics and/or for the sale or sharing of information with third parties even after they choose to reject or block all unnecessary cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

174. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject or block unnecessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

175. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

176. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

177. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of unnecessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Sixth Cause of Action</u>: Unjust Enrichment**

178. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

179. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

180. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could block unnecessary cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications,

including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, reading and subscription behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

181. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

182. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

183. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

184. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

185. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

186. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

187. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: September 24, 2026

**GUTRIDE SAFIER LLP**

*_/s/ Seth A. Safier_*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*